## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KELLEN PARKER**                                          **CIVIL ACTION**

**versus**                                                        **NO. 07-8856**

**N. BURL CAIN, WARDEN**                        **SECTION: "R" (1)**

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Kellen Parker, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On November 22, 2003, he was convicted of first degree murder in violation of La.Rev.Stat.Ann. § 14:30.[2]  On December 16, 2003, he was sentenced to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[3]  On March 29, 2005, the Louisiana Fifth Circuit Court of Appeal affirmed that conviction and sentence.[4]  The Louisiana Supreme Court then denied the related writ application on January 13, 2006.[5]

On or after September 20, 2006, petitioner filed with the state district court an application for post-conviction relief.[6]  That application was denied on October 4, 2006.[7]  His related writ applications were then denied by the Louisiana Fifth Circuit Court of Appeal on November 9, 2006,[8] and the Louisiana Supreme Court on September 28, 2007.[9]

---

[2]  State Rec., Vol. XVII of XVIII, transcript of November 22, 2003, p. 61; State Rec., Vol. III of XVIII, minute entry dated November 22, 2003.

[3]  State Rec., Vol. XVII of XVIII, transcript of December 16, 2003; State Rec., Vol. III of XVIII, minute entry dated December 16, 2003.

[4]  State v. Parker, 901 So.2d 513 (La. App. 5th Cir. 2005) (No. 04-KA-1017); State Rec., Vol. VIII of XVIII.

[5]  State v. Parker, 920 So.2d 235 (La. 2006) (No. 2005-KO-1451); State Rec., Vol. VIII of XVIII.

[6]  State Rec., Vol. VIII of XVIII.

[7]  State Rec., Vol. VIII of XVIII, Order dated October 4, 2006.

[8]  Parker v. Cain, No. 06-KH-829 (La. App. 5th Cir. Nov. 9, 2006) (unpublished); State Rec., Vol. VIII of XVIII.

[9]  State ex rel. Parker v. State, 964 So.2d 358 (La. 2007) (No. 2006-KH-2940); State Rec., Vol. XVIII of XVIII.

On October 15, 2007, petitioner filed the instant federal application for *habeas corpus* relief claiming that he received ineffective assistance of counsel both at trial and on appeal.[10]  On or about April 1, 2008, he filed a motion for leave to amend that application to add a <u>Batson</u> claim.[11]  That motion was granted on April 4, 2008.[12]  The state argues that petitioner's federal application should be dismissed as untimely or, alternatively, on the merits.

<u>Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his conviction or sentence becomes "final."  Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).[13]

As noted, on January 13, 2006, the Louisiana Supreme Court denied petitioner's writ application challenging the state intermediate appellate court's judgment affirming his conviction and sentence.  For AEDPA purposes, his conviction became "final" ninety (90) days later when his period expired for seeking a writ of certiorari from the United States Supreme Court.  <u>See</u> <u>Roberts v. Cockrell</u>, 319 F.3d 690, 694 (5th Cir. 2003); <u>Ott v. Johnson</u>, 192 F.3d 510, 513 (5th Cir. 1999); <u>Chester v. Cain</u>, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); <u>see</u>

---

[10]  Rec. Doc. 1.

[11]  Rec. Doc. 14.  <u>See</u> <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

[12]  Rec. Doc. 15.

[13]  Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are inapplicable in the instant case.

also U.S. Sup. Ct. R. 13(1).[14] Accordingly, petitioner's one-year period for seeking federal *habeas corpus* relief commenced on April 13, 2006, and expired one year later on April 13, 2007, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court.  28 U.S.C. § 2244(d)(2).

One hundred fifty-nine (159) days of the limitations period elapsed prior to being tolled by the filing of the post-conviction application on September 20, 2006.  Although that application was denied, tolling continued uninterrupted through the appellate process, so long as appellate review was sought in a timely manner.  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004).  Assuming that petitioner's related writ applications were timely filed,[15] the Court finds that tolling continued in this case until the Louisiana Supreme Court denied relief on September 28, 2007.[16]

---

[14]   The state argues that petitioner's conviction and sentence became final even earlier because his Louisiana Supreme Court writ application was untimely filed.  While that may be true, the Court cannot make that determination based on the record before it, because there is no evidence of when that application was given to prison authorities for mailing.  See Causey v. Cain, 450 F.3d 601, 604-05 (5th Cir. 2006) (federal courts must apply Louisiana's "mailbox rule" when determining the filing date for state court filings).

[15]   The state does not argue and the state court records do not establish that the appellate filings were untimely.

[16]   A petitioner receives no tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief.  Lawrence v. Florida, 127 S.Ct. 1079, 1083 (2007); Ott v. Johnson, 192 F.3d 510, 512 (5th Cir. 1999).

When the statute of limitations resumed running at that point, two hundred six (206) days of the limitations period remained, meaning that his federal limitations period expired on April 21, 2008.  Because the original petition and the amended petition were filed prior to that date, both were timely.[17]

<u>Standard of Review</u>

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).   The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but

---

[17] An amended petition asserting a new claim must itself be filed within the applicable limitations period.  <u>Mayle v. Felix</u>, 545 U.S. 644 (2005).

unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> At trial, Troy Arnaud testified that on June 6, 2002, Dustin Dressner (also known as "Shorty") picked him up and later picked up defendant, Kellen Parker, from Billy Rumsfield's house on Taffy Street.  Troy had known defendant since elementary school; however, Dustin and defendant met for the first time that day.  The three drove around and went to Dustin's friend's house in Westwego and later to his girlfriend's apartment complex.  Troy and defendant stayed in the car while Dustin went inside his girlfriend's apartment.  Both Troy and defendant testified that when Dustin returned to the car, he appeared upset.  After leaving, the three went to pick up money from Troy's girlfriend, Amy Rome, at her apartment in Marrero.  When Troy went inside, Dustin followed him to get a knife from the kitchen drawer to fix his radio.  After leaving Amy's apartment, they drove to a store and Troy went inside to get some Cisco wine.
>
> According to Troy, Dustin then claimed he was going to a friend's house and asked "was we about hurting somebody," and defendant responded that he was "about whatever; it don't matter."  After arriving at a house in Oak Cove, defendant and Dustin went to the front door and Troy remained in the car.

According to Shannon Fasullo, at approximately 11:30 p.m., her husband, Paul Fasullo, and their daughter, Samantha, were asleep when she heard a knock on the door.  She answered the door and saw a black male and Dustin, who is a white male.  Dustin asked if Shannon's nephew, Michael, was there and if he could come inside.  To both questions, Shannon answered no.

After hearing glass break, Troy looked to the doorway and saw Dustin holding a broken Cisco wine bottle and defendant attacking Shannon.  After Shannon got up and ran, Troy witnessed defendant, who is a black male, run after her.  Shannon testified that the black male attacked her repeatedly while she called for Paul.  She finally got to her feet and went into the bedroom and noticed Paul in the doorway fighting with Dustin over a knife.  After picking up her daughter from the bed, she called 911 before being attacked again and suffering numerous more stab wounds.  Shannon locked herself in the bathroom; however, the door was kicked open, and she was stabbed several more times.

Minutes later, defendant came out of the house with a pink piggybank, and Dustin followed holding his shirt with blood covering his chest.  Troy testified that Dustin got into the front passenger seat, pointed a knife at him, and ordered him to drive.  Troy drove them out of the neighborhood, pulled over at Marrero's Discount Store, and then the three began to run.  However, Dustin went back for his car.

Deputy Robert Pellegrin responded to a call regarding this incident at 5313 Tulip Court, and Deputies Thompson and Mendez were already at the scene.  Upon entering the residence, he testified that he observed a red fluid similar to blood and broken glass at the doorway, a crying baby covered in blood, and what appeared to be a deceased body with multiple stab wounds.  Deputy Pellegrin testified that he proceeded to the master bedroom and found Deputy Mendez with Shannon, who was lying on the floor in a pool of blood, suffering from multiple stab wounds.  He was able to obtain a partial description of the perpetrators from her.  A broken knife blade and a watch were left at the scene, and a bloody footprint remained on the bathroom door.

Detective David Morales testified that he observed a paper bag with some broken glass in it, a bottle neck, and a pair of ladies' eyeglasses in the foyer of the residence.  He saw the victim in the hallway and a blood-like substance on the floor leading to the hallway.  He noticed a bathroom door with footprints on it that

appeared to have been forced open, a broken man's wristwatch,[FN3] and a silver knife blade.  Forensic evidence was collected.

> [FN3] It was stipulated that the watch left at the scene belonged to Dustin.

At the hospital, Sergeant Thornton and Detective Kline interviewed Shannon and, in her first statement, she gave general descriptions of the two attackers and indicated that she recognized the white male as someone connected to an individual who knew her nephew.  Based on the interview, officers spoke with her nephew, Michael Fasullo, who gave the name of another individual, Brandon Sapier, who was also interviewed.  Dustin became a suspect and his photograph was included in a line-up.  Shannon identified Dustin as the white male who attacked her.  However, Shannon did not get a good look at the black male who attacked her and, therefore, could not identify him.

On the morning of June 7, 2002, Sergeant Thornton and Detective Morales went to Dustin's house to arrest him and observed him next to his car, which contained a blood-like substance, with a bottle of peroxide and a towel.  Dustin was arrested and his clothes and shoes were seized.

Dustin admitted that he was involved in the killing of the victim.  He also assisted in identifying relevant addresses and in locating physical evidence, such as a knife with a bent blade and a knife handle with a piece of knife attached.[FN4]  Troy and defendant were identified as additional perpetrators.

> [FN4] Timothy Scanlan, an expert in the field of general forensics and tool mark analysis, testified with one-hundred percent certainty that the two pieces of knife, the blade found at the crime scene and the handle, were originally one in the same.  Amy Rome identified the knife as hers.

Troy testified that, on the day after the incident, he met up with defendant while walking toward Billy Rumsfield's house on Taffy Street and defendant told him a man and woman got hurt but "we ain't did nothing to a little child."  Later that evening, both Troy and defendant were arrested at Billy's house.  Billy's mother turned over clothes she believed to be defendant's which contained blood-like substances on them.  While giving a statement to Detective

Morales, defendant positively identified these clothes as the clothes he was wearing on the night of the incident. His tennis shoes were also seized.

Defendant testified that he got out of the car only to use the bathroom, and once Dustin started to attack Shannon, he tried to assist her by holding him back. He admitted that the footprint on the door was his from his attempt to close the door on Dustin's hand. Defendant denied knowing anything about a piggybank,[FN5] carrying a knife that night, and stabbing either Paul or Shannon. In fact, defendant claimed he never saw Paul. Defendant explained that he only confessed to stabbing Shannon in his statement because Detective Morales told him she said he had stabbed her and he did not know why she would lie. Defendant admitted that he was the black male standing at the door that night and that blood from both of the victims was found on the clothes he wore that night because of his struggle with Dustin.

> [FN5] Shannon described missing jewelry and told the officers that the piggybank contained $40 to $50. Troy was able to take the police to the location of the piggybank.

Dr. Susan Garcia, an expert in the field of forensic pathology, performed an autopsy on the homicide victim, Paul Fasullo, and testified that he sustained injuries primarily to the head and neck region, with the lethal stab wound being to his upper chest which caused internal bleeding.[18]

### Ineffective Assistance of Counsel

Petitioner claims that both his trial and appellate counsel were ineffective. In the state post-conviction proceedings, the state district court rejected petitioner's claims, holding:

> To prevail in a post-conviction ineffective assistance of counsel claim, the defendant must establish (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) that there is a reasonable

---

[18]   State v. Parker, 901 So.2d 513, 516-18 (La. App. 5th Cir. 2005) (No. 04-KA-1017); State Rec., Vol. VIII of XVIII.

> probability that but for counsel's inadequate performance the outcome of the trial would have been different.  <u>State v. Hongo</u>, WL 762818 (La. 1997) citing <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
>
>> Defendant's allegations fail to overcome the burden imposed upon him by <u>Strickland</u>.
>>
>> Upon review, the Court finds the defendant is not entitled to the relief sought.[19]

Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court on such claims unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002).

As noted by the state court, the United States Supreme Court, in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  <u>Id</u>. at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998).

---

[19]  State Rec., Vol. VIII of XVIII, Order dated October 4, 2006.  The Louisiana Fifth Circuit Court of Appeal found "no error" in that ruling.  <u>Parker v. Cain</u>, No. 06-KH-829 (La. App. 5th Cir. Nov. 9, 2006) (unpublished); State Rec., Vol. VIII of XVIII.  The Louisiana Supreme Court likewise denied relief without assigning reasons.  <u>State *ex rel.* Parker v. State</u>, 964 So.2d 358 (La. 2007) (No. 2006-KH-2940); State Rec., Vol. XVIII of XVIII.

Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether the petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.  In order to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.

Petitioner bears the burden of proof when asserting an ineffective assistance of counsel claim. Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. Strickland, 466 U.S. at 697.

Petitioner first claims that his trial counsel was ineffective in failing to object to an erroneous jury instruction on the law of principals. On that point, the trial judge instructed the jury as follows:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. However, mere presence on the scene is not enough to concern an individual in a crime. A principal to a crime must personally possess the requisite mental intent required for the commission of the offense. It is not enough to find merely that his co-conspirator or accomplice had the necessary mental state, since this intent cannot be transferred to the defendant.[20]

Petitioner does not dispute that the instruction, which in part simply tracks La.Rev.Stat.Ann. § 14:24, was legally correct; indeed, he has no basis for doing so. State v. Buchanon, 673 So.2d 663, 668 (La. App. 1st Cir. 1996) (jury charge tracking § 14:24 was not erroneous). Rather, petitioner argues that the instruction is incomplete. He opines that his counsel should have urged the judge to further instruct that not all principals are automatically guilty of the same grade of offense, and

---

[20] State Rec., Vol. XVII of XVIII, transcript of November 22, 2003, p. 49.

that one who aids and abets the commission of a crime may be charged and convicted with a higher or lower degree of the crime, depending on the mental element proved at trial.  However, it is clear that the additional instruction was not legally required and did not render incomplete the instruction given.  State v. Scott, 490 So.2d 396, 403 (La. App. 5th Cir. 1986).  Nevertheless, even if the Court were to assume that counsel performed deficiently in not requesting such an optional instruction, the Court finds that, for the following reasons, petitioner cannot show the prejudice necessary to support his claim.

> The jurors were instructed:
>
>> First degree murder is the killing of a human being:
>> When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of an aggravated burglary or armed robbery; or when the offender has a specific intent to kill or inflict great bodily harm upon more than one person.
>> Specific criminal intent is that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow from his act or failure to act.  Specific intent can be formed in an instant.[21]

They were further instructed that, if they found the evidence was insufficient to convict petitioner of first degree murder, they were to return a verdict of guilty of second degree murder, guilty of manslaughter, or not guilty.[22]  By returning a verdict of guilty of first degree murder, thereby expressly rejecting the lesser options, it is evident that the jurors found that petitioner separately had the requisite intent necessary to be convicted of the most serious grade of the offense.  Therefore,

---

[21]  State Rec., Vol. XVII of XVIII, transcript of November 22, 2003, p. 50.

[22]  State Rec., Vol. XVII of XVIII, transcript of November 22, 2003, pp. 53 and 55-57.

there is simply no reason to believe that the jury would have returned a different verdict if only they had been given the additional optional charge now suggested by petitioner.  Accordingly, petitioner has not demonstrated that he was prejudiced by counsel's failure to request that charge.

Petitioner next claims that his trial counsel was ineffective in failing to request a special jury instruction on the suspect nature of an accomplice's testimony.  Under Louisiana law, a trial judge is to instruct the jury to treat with caution the *uncorroborated* testimony of an accomplice.  State v. Schaffner, 398 So.2d 1032, 1035 (La. 1981); State v. Murray, 375 So.2d 80, 88 (La. 1979).  However, "[w]here there is material corroboration of the accomplice's testimony, the cautionary accomplice instruction is not required."  Schaffner, 398 So.2d at 1035; Murray, 375 So.2d at 88.  Indeed, in Murray, the Louisiana Supreme Court indicated that such a cautionary instruction in that situation may prejudice the prosecution:

> As observed by the court in United States v. Lee, [506 F.2d 111, 120 (D.C. Cir. 1974)]:
>
>> When there is no corroboration, the problem of perjury looms large and warrants a judicial exposition of the frailities of accomplice testimony.  When the accomplice's testimony is corroborated in material degree, there is no significant special problem of perjury; the persisting problem of perjury in fact in the specific case is like that which besets trials generally.  The jury has the benefit of the general instruction on credibility, of its own awareness of the witness' criminality, and of the latitude given defense counsel to explore the witness' possible interest, both by eliciting facts and by discourse in argument.  If now the judge gives a special warning he may be unduly tilting the jury's consideration.

Murray, 375 So.2d at 88.  Nevertheless, even if the Court were to assume that counsel performed deficiently in not requesting such an instruction, the omission of the instruction was not so crucial as to undermine confidence in the verdict in this case because (1) the jury was undoubtably cognizant of facts that would have weakened the accomplice's testimony, including the fact that he was testifying pursuant to a plea agreement,[23] (2)  the jury was instructed generally on how to evaluate witness testimony,[24] and (3) the other evidence of petitioner's guilt was substantial. Therefore, petitioner suffered no prejudice and federal *habeas* relief is not warranted.  See, e.g., Geiger v. Cain, No. 06-31296, 2008 WL 3021017, at *6 (5th Cir. Aug. 6, 2008); Blue v. Stovall, Civ. No. 2:06-CV-11164, 2008 WL 82217, at *4 (E.D. Mich. Jan. 8, 2008).

Lastly, petitioner claims that both his trial counsel and appellate counsel were ineffective in failing to challenge the sufficiency of the evidence to support the conviction.  As a matter of federal law, the United States Supreme Court has noted that, when considering whether there was sufficient evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

---

[23]   In exchange for his testimony, Troy Arnaud was allowed to plead guilty to accessory after the fact and receive a five-year sentence.  State Rec., Vol. XIV of XVIII, transcript of November 20, 2003, p. 68.

[24]   The jury was instructed:  "In evaluating the testimony of a witness, you may consider ... any reason he or she may have for testifying in favor of or against the State or the defendant ...."  State Rec., Vol. XVI of XVIII, transcript of November 22, 2003, pp. 45-46.  In his closing argument, defense counsel used the prosecution's deal with Arnaud to question his veracity, stating:  "They made a deal with the devil, Troy Arnaud, a man who wouldn't know the truth if it jumped up and bit him right square in the ass."  State Rec., Vol. XVI of XVIII, transcript of November 22, 2003, p. 27.  Despite these facts, the jury nevertheless evidently found Arnaud's testimony to be credible.

have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  As a matter of state law, Louisiana courts are controlled by the same standard.  <u>State v. Mitchell</u>, 772 So.2d 78, 82 (La. 2000); <u>see also</u> La.C.Cr.P. art. 821.  In the instant case, there was abundant evidence of petitioner's guilt, including the testimony of Troy Arnaud and Shannon Fasullo, petitioner's own admission of his involvement, and the ample physical evidence.  Clearly, that evidence, when viewed in the light most favorable to the prosecution, was more than sufficient for any rational trier of fact to have found the essential elements of the crime proven beyond a reasonable doubt.  Therefore, petitioner cannot demonstrate that he was prejudiced by the failure of his trial counsel and his appellate counsel to challenge the sufficiency of the evidence.[25]

       In summary, the undersigned finds that state court identified the proper standard, i.e. the <u>Strickland</u> standard, and applied it in a reasonable manner.  Therefore, petitioner has failed to demonstrate that the state court's decisions rejecting his ineffective assistance of counsel claims were contrary to, or involved an unreasonable application of, clearly established federal law, as

---

[25] In his "Motion to Traverse in Opposition to the State's Response," Rec. Doc. 13, petitioner indicates that, in addition to this ineffective assistance of counsel claim, he also means to independently challenge the sufficiency of the evidence as a separate claim.  However, even if the Court considers that as a distinct claim, it still has no merit.  As noted, such claims are analyzed under the <u>Jackson</u> standard and must be rejected if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution.  <u>Santellan</u>, 271 F.3d at 193 (5th Cir. 2001).  Further, in assessing such a claim, this Court does not try to determine whether the trier of fact made the *correct* guilt or innocence determination; rather, the only question is whether the trier of fact made a *rational* decision to convict.  <u>Id</u>.  Again, the evidence of petitioner's guilt in this case was substantial and clearly more than sufficient to convict petitioner as a principal with respect to the first degree murder of Paul Fasullo.

determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects those claims.

Batson Claim

Petitioner's next claim is that the prosecutor used his peremptory challenges to exclude jurors on the basis of race.  On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> [D]efendant argues that the trial court committed reversible error by not ruling that the State was eliminating jurors on the basis of race and denying his Batson[FN9] challenge.  He claims the exercise of peremptory challenges to exclude all of the black jurors constituted a *prima facie* case of discrimination.  Defendant further contends that meaningful black participation in the deliberations of this case was denied after the State gave "bogus reasons" for striking these jurors which violated the appellant's right to be tried by a jury selected on non-racial criteria.  Specifically, defendant challenges the excusal of Debra Bush,[FN10] Reaun Paige, Jerri Sue Karagul, Nicholle Chopin, and Angela Davis.  The State responds that the trial court properly found that the State established a race-neutral explanation for striking each of the individuals in question.  It further recognizes the great deference accorded the trial judge in a denial of a Batson challenge.
>
> > FN9. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
> >
> > FN10. Although defendant questions the excusal of Debra Bush, the record reflects that Delisa Bush was the only potential juror with that last name in the first panel.  Accordingly, we examine the excusal of Delisa Bush.
>
> The United States Supreme Court held in Batson that the Equal Protection Clause prohibits the peremptory challenge of a prospective juror based on race.  State v. Robinson, 02-1869 (La. 4/14/04), 874 So.2d 66, 84, cert. denied, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004).  LSA-C.Cr.P. art. 795(C), likewise,

– 17 –

provides that no peremptory challenge shall be made based solely on the juror's race.  Subsection (C) further provides the following:

> If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror.  Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.

In Batson, the Supreme Court supplied a three-step analysis to determine whether the jury selection was made in an impermissibly discriminatory manner.  First, a defendant must establish a *prima facie* case of discrimination by presenting facts and relevant circumstances that raise an inference that the prosecutor used peremptory challenges to exclude potential jurors based on their race. State v. Kirsch, 04-214 (La.App. 5 Cir. 7/27/04), 880 So.2d 890, 896. Second, once a *prima facie* case is established, the State then bears the burden to provide race-neutral explanations for its peremptory challenges.  Id.; Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839 (1995).  Third, if the State provides race-neutral explanations, the trial court must determine whether the opponent of the strike has carried his burden of proving purposeful discrimination.  State v. Jones, 98-842 (La.App. 5 Cir. 2/10/99), 729 So.2d 57, 62.

The defendant bears the ultimate burden of persuasion to prove purposeful discrimination.  State v. Kirsch, *supra* at 898.  The question becomes "whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present." State v. Hobley, 98-2460 (La. 12/15/99), 752 So.2d 771, 783, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000).  To determine discriminatory intent, the trial court should consider all other statements or actions by the prosecutor during the course of voir dire.  Id.

In State v. Toussant, 98-1214 (La.App. 5 Cir. 5/19/99), 734 So.2d 961, 964, writ denied, 99-1789 (La. 11/24/99), 750 So.2d 980, this Court stated:

> A trial judge's determination pertaining to purposeful discrimination rests largely on credibility evaluations, so his findings are entitled to great deference by the reviewing court.  The trial judge, advantaged by observing the characteristics and demeanor of the attorneys and prospective jurors, occupies the best position for deciding whether a discriminatory objective underlies peremptory challenges. (citations omitted)

Credibility can be measured by, among other factors, the prosecutor's demeanor, how reasonable or improbable the explanations are, and whether the proffered rationale has some basis in accepted trial strategy.  State v. Kirsch, *supra* at 896.

A single instance of race discrimination in the jury selection process not identified and corrected by the trial court constitutes reversible error.  State v. Lewis, 01-155 (La.App. 5 Cir. 8/28/01), 795 So.2d 468, 471, writ denied, 01-2682 (La. 8/30/02), 823 So.2d 939.  In the present case, defendant made a Batson challenge after the State excused Angela Davis, noting that the prosecutor had exercised peremptory challenges on every black juror in the two panels examined.  The trial court agreed that a pattern existed,[FN11] and the State then provided its reasons for excusing these jurors.

> [FN11] A trial judge's demand that a prosecutor justify his peremptory strikes is tantamount to a finding that the defense has presented evidence to meet its initial burden in step one, or that a *prima facie* case of discrimination has been made.  State v. Green, 94-0887 (La. 5/22/95), 655 So.2d 272, 288.

The State expressed that it excused Delisa Bush because she shook her head and rolled her eyes while two other prospective jurors, Ms. Smith and Ms. Falcon, were being questioned.  Because of this, the State did not believe she would listen to the opinions of others or be able to deliberate fairly.  With regard to Reaun Paige, the State noted that she failed to change her posture during its presentation and crossed her arms while leaning to one side; however, when defense counsel stood up, she leaned forward and was receptive to what he was stating.

When accepted by the trial judge, the exercise of a peremptory challenge based upon a prospective juror's body language does not violate Batson.  State v. Hoffman, 98-3118 (La. 4/11/00), 768 So.2d 542, 559, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).  In addition, perceived hostility, lack of interest and unresponsiveness are race-neutral reasons for excluding potential jurors.  State v. Duplessy, 03-185 (La.App. 5 Cir. 7/29/03), 853 So.2d 77, 82, writ denied, 03-2416 (La. 2/6/04), 865 So.2d 739.

Additionally, Ms. Paige's profession was credit card collections and the State wanted to dismiss her based on past dealings with individuals of this profession.  Challenges based upon the potential juror's profession have been upheld as race-neutral.  Id. Further, Ms. Paige's questionnaire indicated that she was generally opposed to the death penalty.  A juror's views or perceived views on imposition of the death penalty may constitute a sufficient race-neutral explanation.  State v. Durham, 94-1036 (La.App. 5 Cir. 4/16/96), 673 So.2d 1103, 1112.   Accordingly, based on the explanations provided by the State as well as the law on this issue, we find that the trial court did not err in ruling that Ms. Bush and Ms. Paige were excused for race-neutral reasons.

With regard to Angela Davis, the State indicated that she was excused due to her indecisiveness.  It initially tried to strike her during the Witherspoon[FN12] examination, after she indicated on her questionnaire that she would always vote for imposing the death penalty and later expressed that she could never vote for it.  However, the court found that she was rehabilitated.  As stated above, a juror's views on imposing the death penalty may be a sufficient race-neutral reason for excluding the juror.  State v. Durham, supra.  Further, concern about inconsistent answers can form the basis for a race-neutral explanation.  See State v. Hoffman, supra at 559.  The record shows Ms. Davis' views on the death penalty and confirms her indecisiveness.  Accordingly, we find that the trial court was correct in denying the Batson challenge as to Ms. Davis.

> [FN12] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).   During Witherspoon questioning, if a prospective juror's views on the death penalty are such that they would "prevent or substantially impair the performance of duties in accordance with the instructions [or] the oath," whether those views are for or against the death

penalty, he or she should be excused for cause.  <u>State v. Taylor</u>, 99-1311 (La. 1/17/01), 781 So.2d 1205, 1214, <u>cert. denied</u>, 534 U.S. 844, 122 S.Ct. 106, 151 L.Ed.2d 64 (2001).

As to Nicholle Chopin, the State also tried to strike her during the <u>Witherspoon</u> examination.  The State argued that although she failed to respond to the questionnaire, she was anti-death penalty.  However, Ms. Chopin admitted to defense counsel that she could consider imposing the death penalty in certain situations such as the bombings of the World Trade Center and in Oklahoma City.  As noted previously, weak responses regarding the imposition of the death penalty or indecisiveness are appropriate race-neutral reasons to exercise peremptory challenges.  <u>State v. Durham</u>, *supra*.  Based on her inconsistent responses regarding the death penalty, the State had race-neutral reasons for excusing Ms. Chopin.  Therefore, we find that defendant's <u>Batson</u> challenge as to Ms. Chopin was properly denied.

According to the record, Jerri Sue Karagul was not included in the <u>Batson</u> challenge of defendant.  Defendant failed to object at the time Ms. Karagul was excused; in addition, her name was not mentioned during the <u>Batson</u> challenge process.  Defense failed to initiate the three-step <u>Batson</u> procedure; as a result, the State did not offer race-neutral reasons for challenging Ms. Karagul, and the trial court did not rule on this issue.  Therefore, the State contends that this issue has been waived.

The Louisiana Supreme Court has consistently held that when a defendant fails to timely raise an objection to irregularities in the jury selection process, review of those irregularities are waived.  <u>State v. Snyder</u>, 98-1078 (La. 4/14/99), 750 So.2d 832, 840.  Because defendant failed to object when Ms. Karagul was excused, he has waived this issue.  However, we note that even if this issue had been preserved for appeal, the record reflects race-neutral reasons as to why Ms. Karagul was excused.  At the time of the jury selection process, Ms. Karagul was under two separate subpoenas, including one pending misdemeanor criminal charge.  It is reasonable that the State could feel that she would be biased against it or distracted by her upcoming court appearances.  A prospective juror's criminal background may serve as a sufficient race-neutral explanation.  <u>State v. Banks</u>, 96-652 (La.App. 5 Cir. 1/15/97), 694 So.2d 401, 408.

After the State provided its reasons for striking these individuals, the Court expressed "I think he's given race neutral

– 21 –

reasons that I can independently verify from looking at the prospective jurors throughout voir dire." The trial judge was in the best position to examine the State's sincerity in its race-neutral explanations for challenging prospective jurors. Considering that a trial judge's determinations regarding purposeful discrimination rest largely on credibility evaluations and that great deference is given to the trial judge in making this determination, we find that the trial court did not err in denying defendant's <u>Batson</u> challenges. Accordingly, this assignment of error is without merit.[26]

As correctly noted by the state court, claims of racial discrimination in jury selection are analyzed utilizing the three-step procedure established by the United States Supreme Court in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

In the instant case, <u>Batson</u>'s first step poses no problem. In that first step, "the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race." <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006). At the time the <u>Batson</u> challenge was made here, the prosecutor had used his peremptory strikes to remove all black jurors on the panels remaining after the challenges for cause were resolved.[27] The trial judge clearly found that a prima facie case of discrimination had been shown, noting: "He's got a pattern, every black juror has been stricken."[28]

<u>Batson</u>'s second step likewise poses no problem. In that second step, "the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." <u>Rice</u>,

---

[26] <u>State v. Parker</u>, 901 So.2d at 521-24; State Rec., Vol. VIII of XVIII. The Louisiana Supreme Court denied petitioner's related writ application without assigning reasons. <u>State v. Parker</u>, 920 So.2d 235 (La. 2006) (No. 2005-KO-1451); State Rec., Vol. VIII of XVIII.

[27] It is not clear which, if any, of the jurors removed for cause were black.

[28] State Rec., Vol. XIV of XVIII, transcript of November 19, 2003, p. 223.

546 U.S. at 338.  Here, the prosecutor's strikes were allegedly based on concerns relating to the jurors' body language,[29] employment,[30] and opposition to and indecisiveness regarding the death penalty.[31]  In evaluating such explanations, it must be remembered that, "[a]lthough the prosecutor

---

[29]  The prosecutor cited concerns about body language in explaining his strikes of Reaun Paige and Delisa Bush.  As to Paige, the prosecutor stated:  "Judge she didn't change her body posture during my entire presentation.  She had her arms crossed and was leaning to one side.  Mr. Armond [defense counsel] stood up.  She leaned forward and was very receptive to what he was saying."  State Rec., Vol. XIV of XVIII, transcript of November 19, 2003, p. 224.  As to Bush, the prosecutor stated:

> With regard to Ms. Bush, during the Court's interview with [prospective juror] Kathy Smith, which was the very first juror.  Ms. Smith said something about having friends that are police.  During that whole time she rolled her eyes and shook her head.  During the time that we discussed things with [prospective juror] Ms. Falcon, she was shaking her head and rolling her eyes.  It's my opinion that she's not someone who's going to listen to the opinions of the other jurors.  She's not going to fairly deliberate as the Court's going to instruct her.

State Rec., Vol. XIV of XVIII, transcript of November 19, 2003, p. 224.

[30]  As to Paige, the prosecutor also cited concerns about her employment, stating:  "[S]he's credit card collections.  I've had prior past dealings with people in credit card collections ...."  State Rec., Vol. XIV of XVIII, transcript of November 19, 2003, p. 224.

[31]  As a third justification for striking Paige, the prosecutor noted that "she circled D [on the juror questionnaire] which is generally opposed to the death penalty."  State Rec., Vol. XIV of XVIII, transcript of November 19, 2003, p. 224.  As to Angela Davis and Nicholle Chopin, the prosecutor stated:

> I attempted to strike both Ms. Davis and Ms. Chopin during Witherspoon, if you will recall, and Ms. Davis was the individual who's very indecisive.  She went back and forth.  I said can we come back to you with regard to your feelings with whether or not you could consider both.  She said, yes.  Furthermore, she circled A [on the juror questionnaire] which is she would always vote for the imposition of the death penalty.  And then later, during questioning, she said, I could never do it.  Mr. Armond, and the Court agreed with him, rehabed her and then after a very long discussion, very long question, she simply said yes.  The Court felt she had been sufficiently rehabilitated and denied my motion.  With regard to Ms. Chopin, Judge,

–  23  –

must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices." Rice, 546 U.S. at 338 (quotation marks and brackets omitted). The stated bases here are not inherently discriminatory and, therefore, are sufficient to meet the low threshold required by Batson's second step.

The only real issue is whether Batson's third step was met. The United States Supreme Court has held:

> [In Batson's third step,] the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

Rice, 546 U.S. at 338 (citations and quotation marks omitted). However, the United States Supreme Court has noted: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller-El v. Dretke, 545 U.S. 231, 241 (2005).

---

she had no response on the questionnaire. She was anti-death penalty. It wasn't until Mr. Armond went back, and the same thing, he rehabed Chopin and Davis at the same time and after the very same diatribe with regard to whether or not she could consider it against the World Trade Center bombings or Oklahoma City. She then said, yeah, I could consider it in that case.

State Rec., Vol. XIV of XVIII, transcript of November 19, 2003, pp. 223-24.

Turning first to the strikes purportedly based on the jurors' body language, it is clear that peremptory challenges based on such nonverbal cues are permissible.  United States v. Roberts, 913 F.2d 211, 214 (5th Cir. 1990) ("Intuitive assumptions about a potential juror's interest and attitudes can be acceptable as a neutral explanation for a peremptory challenge."); see also Dillard v. Collins, No. 93-2163, 1993 WL 530253, at *3 (5th Cir. Dec. 10, 1993) ("[I]ntuitive assumptions and subjective considerations such as eye contact and demeanor, even standing alone, are sufficient reasons to withstand a Batson challenge."); United States v. Geiger, No. 92-8579, 1993 WL 309940, at *2 (5th Cir. May 13, 1993) ("Body language is a permissible reason for exercising a peremptory challenge.  Demeanor may indicate sympathies or antagonisms justifying peremptory exclusion of a venireperson." (citation omitted)).  Further, it is extremely difficult for a reviewing court to independently assess the persuasiveness of such explanations from a cold transcript.  Only the trial judge is in a position to determine whether the challenged juror in fact exhibited such nonverbal behaviors and whether there were other jurors who behaved similarly and yet went unchallenged.  Additionally, as to such matters, the United States Supreme Court has held that such challenges turn largely on issues of credibility and, therefore, great deference must be given to the trial judge's determination:

> [R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance.  In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.  We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province, and we have

> stated that in the absence of exceptional circumstances, we would
> defer to the trial court.

Snyder v. Louisiana, 128 S.Ct. 1203, 1208 (2008) (citations, quotation marks, and brackets omitted).

In the instant case, the state court found credible the prosecutor's explanation that Reaun Paige and Delisa Bush were stricken based on their demeanor and body language. Under the AEDPA, this federal court must defer to that state-court conclusion unless petitioner demonstrates that the conclusion "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); Rice, 546 U.S. at 338. Moreover, such state-court factual findings are *presumed* to be correct, and petitioner may be granted relief only if he rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Miller-El, 545 U.S. at 240. In this case, petitioner simply has not met his burden. He has offered no persuasive rebuttal to the state court's finding that the prosecutor's actions in striking Paige and Bush were race-neutral; rather, he essentially just invites this Court to substitute its own credibility judgments for those of the state court. The Court cannot oblige. Even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, ... on habeas review that does not suffice to supersede the trial court's credibility determination." Rice, 546 U.S. at 341-42.

As to Paige, the prosecutor explained that she was stricken for the additional reason that she worked in collections, indicating that he had previously experienced difficulties with jurors in that profession. The United States Fifth Circuit Court of Appeals has specifically held that blanket exclusions of potential jurors in certain occupations do not violate Batson. See, e.g., Dillard v. Collins, No. 93-2163, 1993 WL 530253, at *3 (5th Cir. Dec. 10, 1993). Further, there is no indication in the record that the occupation-based challenge here was a pretext; for example, there

were no jurors with the same or an equivalent occupation who went unchallenged.  Again, the state court found the prosecutor's explanation credible, and there is simply no basis for holding that the state-court finding in that respect was an unreasonable determination of the facts in light of the evidence or that petitioner had successfully rebutted the presumption of correctness with clear and convincing evidence.

Lastly, the prosecutor explained that Paige was additionally stricken because she was opposed to the death penalty and that Angela Davis and Nicholle Chopin were stricken based on their indecisiveness regarding whether they could impose the death penalty.  As to Paige, she noted on her juror questionnaire that she was generally opposed to the death penalty.[32]  As to Davis, she indicated on her juror questionnaire that she favored the death penalty; however, she later said that "it was just a questionnaire or whatever, I just probably circled anything."[33]  Upon questioning, she indicated that she was scared of voting for death but could consider it based on all the evidence.[34]  As to Chopin, she initially stated that she was against the death penalty and could not foresee any situation in which she would consider voting for death; however, she later indicated that she could consider in cases of terrorist attacks and brutal crimes against children.[35]

It is clear that a prospective juror's answers evincing a reluctance to impose the death penalty is a valid and acceptable race-neutral explanation sufficient to overcome a <u>Batson</u> challenge.

---

[32]  State Rec., Vol. XI of XVIII, transcript of November 17, 2003, p. 173.

[33]  State Rec., Vol. XI of XVIII, transcript of November 17, 2003, pp. 228, 247, and 264.

[34]  State Rec., Vol. XI of XVIII, transcript of November 17, 2003, pp. 228-29, 247, and 265.

[35]  State Rec., Vol. XI of XVIII, transcript of November 17, 2003, pp. 225 and 262-63.

See Haynes v. Quarterman, 526 F.3d 189, 200 (5th Cir. 2008); Johnson v. Scott, No. 95-20117, 1995 WL 581932, at *3 (5th Cir. Sept. 12, 1995) ("Batson does not apply in the context of a juror's attitude towards the death penalty."). Of course, a Batson challenge may be sustained if the prosecutor uses peremptory strikes against only black members of the venire expressing such views while accepting white prospective jurors who express a similar reluctance. See Miller-El, 545 U.S. at 241. However, petitioner identifies no such nonblack prospective jurors who espoused substantially similar opinions and yet were nevertheless accepted. Moreover, no such similarly-situated prospective jurors were readily apparent from this Court's review of the transcripts of entire voir dire proceedings. Therefore, again, the undersigned concludes that there is simply no basis for holding that the state-court finding with respect to this claim was an unreasonable determination of the facts in light of the evidence or that petitioner had successfully rebutted the presumption of correctness with clear and convincing evidence.

In summary, in light of the AEDPA's deferential standard, and for all of the foregoing reasons, the Court finds that petitioner's Batson claim as to Reaun Paige, Delisa Bush, Angela Davis, and Nicholle Chopin should be rejected.

The Court notes that petitioner also reasserts his Batson claim as to Jerri Sue Karagul in his federal application. However, as noted by the state court, Karagul was not included in the Batson challenge asserted during voir dire, and, accordingly, any such claim against Karagul in this federal proceeding is procedurally barred.

Regarding procedural bars, the United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person
> in its custody may not be reviewed by a federal court if the last state

> court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision. To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. This rule applies to state court judgments on both substantive and procedural grounds. Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted). "A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a [petitioner's] claim." Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999).

The procedural rule invoked here, i.e. that a claim concerning irregularities in the jury selection process is waived unless the defendant raised a timely objection, is obviously independent of the merits of the federal claim. Therefore, the Court needs only to determine whether that rule was "adequate."

"The [procedural bar] doctrine presumes that a state procedural ground is adequate ... and, ordinarily, the burden is on the habeas petitioner to demonstrate otherwise." Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999). In order to establish that a state procedural rule is not "adequate," a petitioner bears the burden of showing that the state did not strictly or regularly follow the procedural rule. Stokes v. Anderson, 123 F.3d 858, 860 (5th Cir. 1997). Here, petitioner has made no attempt whatsoever to establish that the rule was not strictly or regularly followed. Moreover, in any event, the rule invoked is premised on Louisiana's rule that an error is waived unless a contemporaneous objection is made. State v. Juniors, 915 So.2d 291, 316 (La. 2005)

– 29 –

(applying the contemporaneous objection rule to a <u>Batson</u> claim); <u>State v. Williams</u>, 524 So.2d 746 (La. 1988) (same).  The United States Fifth Circuit Court of Appeal has clearly held that Louisiana's contemporaneous objection rule is an independent and adequate state procedural rule.  <u>Duncan v. Cain</u>, 278 F.3d 537, 541-43 (5th Cir. 2002).

"When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice."  <u>Hughes v. Johnson</u>, 191 F.3d 607, 614 (5th Cir. 1999).  In the instant case, petitioner has demonstrated neither.

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him."  <u>Johnson v. Puckett</u>, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted) (emphasis in original).  Petitioner has made no effort in this federal proceeding to establish cause for the failure to include Karagul in the <u>Batson</u> challenge and to demand a race-neutral explanation for the strike.  In that he has not shown cause, "it is not necessary for the court to consider whether there is actual prejudice."  <u>Martin v. Maxey</u>, 98 F.3d 844, 849 (5th Cir. 1996).

Because petitioner has not met the "cause and prejudice" test, this Court must determine whether the application of the procedural bar would result in a fundamental miscarriage of justice.  In order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him.  Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which

he was convicted."  Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted). The

United States Fifth Circuit Court of Appeals has held:

> To demonstrate actual innocence, it is necessary that the petitioner
> show that it is more likely than not that no reasonable juror would
> have found petitioner guilty beyond a reasonable doubt ... in light of
> all of the evidence, including that alleged to have been illegally
> admitted (but with due regard to any unreliability of it) and evidence
> tenably claimed to have been wrongfully excluded or to have become
> available only after trial.

Lucas v. Johnson, 132 F.3d 1069, 1077 (5th Cir. 1998) (quotation marks and citations omitted).

Applying that standard, the Court finds that petitioner does not make a persuasive showing that he

is actually innocent of the charges against him.  As previously noted, the evidence of petitioner's

guilt was substantial.  Therefore, he has not demonstrated that any miscarriage of justice will result

from the application of the procedural bar.  Accordingly, petitioner's Batson claim as to Jerri Sue

Karagul is procedurally barred in this federal court.[36]

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that petitioner's application for federal

*habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation contained in a magistrate judge's report and recommendation within 10 days after

---

[36]  Further, in any event, the claim has no merit because the prosecution could easily have pointed
to a race-neutral reason to support its strike of Karagul, i.e. she was involved in ongoing state
criminal proceedings.  State Rec., Vol. XI of XVIII, transcript of November 17, 2003, pp. 143-44.
As the state court noted, that fact could cause her to be biased or distracted by her upcoming court
appearances and would therefore suffice as an adequate race-neutral explanation to overcome a
Batson challenge.  See, e.g., United States v. Forrest, 402 F.3d 678, 687 (6th Cir. 2005) (strike based
on prospective jurors record of criminal charges was race-neutral).

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from

a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en

banc).

New Orleans, Louisiana, this nineteenth day of August, 2008.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**